

IN THE
TENTH COURT OF APPEALS

No. 10-10-00440-CV

IN THE INTEREST OF L.D.E. AND C.E., CHILDREN,

From the 361st District Court
Brazos County, Texas
Trial Court No. 08-002659-CV-361

## MEMORANDUM OPINION

After a bench trial, the trial court entered an order terminating appellant Robert's

parental rights to his children, L.D.E. and C.E.[1]  By two issues, Robert argues that:  (1)

the trial court lacked personal and subject-matter jurisdiction over this case; and (2) the

evidence supporting the trial court's conclusion that termination is in the best interests

of the children is legally and factually insufficient.  We affirm.

### I. BACKGROUND

On October 31, 2008, the Texas Department of Family and Protective Services

(the "Department") filed suit to terminate the parental rights of Robert and the mother

---

[1] To protect the identities of the children, we have used fictitious names, Robert and Lucy, in this case to identify appellant and the children's mother, respectively.  *See* TEX. R. APP. P. 9.8(b)(2).  As of the date of this opinion, Lucy has not challenged the trial court's termination order.

of L.D.E. and C.E., Lucy.[2]  As indicated in an affidavit filed by a supervisor with the Department, the initial removal of L.D.E. and C.E. from Robert and Lucy's care was precipitated by numerous allegations of domestic violence and purported drug and alcohol abuse.[3]  The trial court signed orders designating the Department as temporary managing conservator for the children.  The Department subsequently devised family service plans for Robert and Lucy and advanced towards the goal of family reunification.

On June 17, 2009, the trial court signed an order for monitored return of the children to Robert and Lucy after finding that they had "demonstrated adequate and appropriate compliance with their service plan and have demonstrated progress, as indicated by their therapist, Paul Johnson, to the point where the monitored return of the children is appropriate at this time."  Also in this order, the trial court noted that the new dismissal date for the case was December 14, 2009.

After the children were returned to Robert and Lucy's home, the Department was informed about three separate police reports involving allegations of domestic violence between Robert and Lucy.  Robert told police that Lucy was high on cocaine and admitted to physically restraining Lucy from taking the children to a relative's birthday party.  Robert asserted that he physically restrained Lucy to calm her down and to prevent her from taking the children to a relative's house where a registered sex

---

[2] At the time of trial, L.D.E. was four years old, and C.E. was two years old.

[3] In fact, at the time of C.E.'s birth, Lucy tested positive for marihuana.  Lucy admitted to having smoked marihuana during the majority of her pregnancy with C.E.

offender lived. At another time, Lucy allegedly pulled a knife on Robert and threatened to kill him.[4] Lucy alleged that she pulled the knife on Robert because Robert had hit her. Robert admitted that he and Lucy had "bashed each other's [car] windshields in, as a result of more domestic alterations [sic]." Another police report referred to Lucy's complaint that Robert had made false allegations against her—in particular, the allegation that Lucy was high on cocaine while around the children. Lucy's complaint was dismissed after a June 17, 2009 test of her hair follicle indicated that she had in fact ingested cocaine. As a result of Robert and Lucy's repeated interactions with police, the Department once again removed the children from the home. After a hearing on July 27, 2009, the trial court signed an order removing the children from monitored return and placing the children in foster care. Trial date for the final order was set for December 2, 2009.

After removing the children for a second time, Robert and Lucy participated in couple's counseling and individual counseling. The trial court conducted another hearing in this matter on December 2, 2009; afterwards, the trial court entered a second order for the monitored return of the children to Robert and Lucy's home. In its order, the trial court concluded that Robert and Lucy "have each complied with the services ordered by the court and have demonstrated their ability to understand the needs of the children, including the necessity of a stable, violence and drug[-]free, home environment" and stated that the new dismissal date for this matter was May 31, 2010.

_____

[4] Lucy was arrested and charged with aggravated assault with a deadly weapon, though the charge was reduced to the offense of making a terroristic threat. At the time of trial, Lucy was on probation for the offense.

Shortly after being returned to Robert and Lucy's home, the children were once again removed by the Department. This final removal was precipitated by Robert: (1) breaking into the apartment that he shared with Lucy and the children by breaking glass near the door and opening the dead-bolt lock late one evening; and (2) physically restraining Lucy on the floor while the children watched. As a result of the altercation, Lucy sustained a cut on her leg from the broken glass. Robert was arrested and charged with family violence assault; however, at the urging of Lucy, the charges were dropped.[5] On April 29, 2010, the trial court signed an order removing the children from monitored return because: (1) Robert and Lucy had not provided the children with a safe living environment; (2) the children continued to need substitute care; and (3) the children's foster-care placement was appropriate for their needs.

Subsequently, the trial court conducted a bench trial on the Department's termination petition. After hearing testimony from several witnesses, including both Robert and Lucy, the trial court signed an order terminating Robert and Lucy's parental rights to L.D.E. and C.E. Thereafter, Robert filed a motion for new trial and a statement of points to be raised on appeal. The trial court held a hearing on Robert's motion for new trial and statement of points and concluded that Robert was indigent and that his appeal was not frivolous. Findings of fact and conclusions of law were entered. This appeal followed.

---

[5] The record indicates that Robert has an extensive criminal history, including two 1988 convictions for burglary of a building, a 1991 conviction for five counts of delivery of a controlled substance, a 2006 conviction for driving while intoxicated, and this arrest. With regard to his 1991 convictions, Robert received a forty-year sentence; however, after serving approximately ten years of his sentence, Robert was placed on parole until 2030. Therefore, at all relevant times in this appeal, Robert was subject to the provisions of his parole.

## II. ROBERT'S JURISDICTIONAL ARGUMENTS

In his first issue, Robert argues that the trial court lacked personal and subject-matter jurisdiction over this case because it failed to comply with section 263.403 of the family code. *See* TEX. FAM. CODE ANN. § 263.403 (West 2008). In particular, Robert contends that the trial court's order removing the children from monitored return failed to "set forth specific findings regarding the grounds for the order being rendered," as required by section 263.403. *See id.* Because the trial court's order allegedly was not compliant with section 263.403, Robert asserts that the trial court lacked jurisdiction over this case, and thus, the termination order is void. The Department counters that Robert may not assert his challenge to the trial court's removal order because he failed to specifically present this challenge in his statement of points. In addition, the Department argues that even assuming that Robert had properly raised this issue in his statement of points, the trial court's order included specific findings and complied with section 263.403; therefore, the trial court had jurisdiction over this matter, and the termination order is not void.

### A. Applicable Law

Section 263.403, entitled "Monitored Return of Child to Parent," provides that:

(a) Notwithstanding Section 263.401, the court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order that:

> (1) finds that retaining jurisdiction under this section is in the best interest of the child;

> (2) orders the department to return the child to the child's parent;

(3) orders the department to continue to serve as temporary managing conservator of the child; and

(4) orders the department to monitor the child's placement to ensure that the child is in a safe environment.

(b) If the court renders an order under this section, the court shall:

(1) include in the order specific findings regarding the grounds for the order; and

(2) schedule a new date, not later than the 180th day after the date the temporary order is rendered, for dismissal of the suit unless a trial on the merits has commenced.

(c) If a child placed with a parent under this section must be moved from that home by the department before the dismissal of the suit or the commencement of the trial on the merits, the court shall, at the time of the move, schedule a new date for dismissal of the suit unless a trial on the merits has commenced. The new dismissal date may not be later than the original dismissal date established under Section 263.401 or the 180th day after the date the child is moved under this subsection, whichever date is later.

(d) If the court renders an order under this section, the court must include in the order specific findings regarding the grounds for the order.

TEX. FAM. CODE ANN. § 263.403.

## B. Discussion

At the outset of our analysis of this issue, we note that Robert failed to challenge the trial court's April 29, 2010 removal order in his statement of points. Instead, his statement of points focused on the sufficiency of the evidence supporting the trial court's termination order. Section 263.405(i) states that an appellate court may not consider any issue that was not specifically presented to the trial court in a timely-filed statement of points on appeal. *See* TEX. FAM. CODE ANN. § 263.405(i) (West 2008); *In re*

*J.H.G.*, 302 S.W.3d 304, 306 (Tex. 2010); *see also In re G.B.*, No. 10-10-00244-CV, 2011 Tex. App. LEXIS 4206, at *5 (Tex. App.—Waco June 1, 2011, no pet. h.). Though Robert attempts to characterize this issue as a jurisdictional issue that can be raised for the first time on appeal, a reading of his appellate briefs reveals that the crux of this issue is whether the trial court complied with section 263.403 when it entered its removal order. And, because he did not raise this issue in his statement of points, we may not address this issue. *See* TEX. FAM. CODE ANN. § 263.405(i); *In re J.H.G.*, 302 S.W.3d at 306; *see also In re G.B.*, 2011 Tex. App. LEXIS 4206, at *5.

However, even if Robert had properly complained about this issue in his statement of points, we see no error in the trial court's April 29, 2010 removal order, as it complies with section 263.403 of the family code.[6] *See* TEX. FAM. CODE ANN. § 263.403. In fact, the order specifically states findings regarding the grounds for the order and includes a new dismissal date that is not later than the 180th day after the temporary order was rendered. Specifically, the order states that the trial court found:

---

[6] Though section 263.405(i) prohibits us from addressing this issue considering Robert failed to complain about the trial court's removal order in his statement of points, we find it noteworthy that Robert include the following statements in his statement of points:

> Respondent [Robert] has been denied due process by statutorily being required to file points on appeal of all appellate issues without the assistance of the full trial transcript to assist in making the points specific enough to survive a hearing on frivolousness. This requirement is improper, completely defeats Respondent's ability to adequately address all issues and areas where [his] Constitutional rights have been violated and totally deprives [him] of [his] due process rights to effectively [present his] issues to the appellate court.

*See* TEX. FAM. CODE ANN. § 263.405(i) (West 2008). After a hearing, the trial court determined that Robert is indigent and that his appeal is not frivolous; thus, he was entitled to a full record. Therefore, based on the foregoing and out of an abundance of caution, we will address the merits of Robert's issue pertaining to the trial court's removal order.

that neither the child's parents nor any other person or entity entitled to service under Chapter 102, Texas Family Code is willing and able to provide the child . . . with a safe environment, and therefore return of the child to a parent or other person or entity is not in the child's best interest. The child continues to need substitute care and the child's current placement is appropriate for the child's needs. . . . The Court finds that no other plans or services are needed to meet the child's special needs or circumstances.

Because of Robert and Lucy's inability to provide L.D.E. and C.E. with a safe environment, the trial court also concluded that "it was necessary to remove the children from the monitored placement previously ordered." Clearly, the trial court's April 29, 2010 removal order included specific findings to support the removal of the children. *See id.* § 263.403(d). By entering an order that complied with section 263.403, the trial court was authorized to retain jurisdiction over the parties and subject-matter of this case without dismissing or otherwise entering a final order disposing of this case. *See id.* § 263.403(a). As such, we cannot agree with Robert's assertion that the trial court's termination order is void for lack of jurisdiction. Based on the foregoing, we overrule Robert's first issue.

### III. BEST INTEREST OF THE CHILDREN

In his second issue, Robert challenges the sufficiency of the evidence supporting the trial court's finding that termination was in the best interest of the children.

### A. Standard of Review and Applicable Law

#### 1. Termination of Parental Rights

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."

*Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397, 71 L. Ed. 2d 599 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the petitioner seeks not just to limit parental rights but to eradicate them permanently by divesting the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *See Holick*, 685 S.W.2d at 20-21.

In an involuntary termination proceeding brought under section 161.001 of the family code, the Department must establish: (1) at least one ground under subsection (1) of section 161.001; and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the

allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards for termination and modification).

### 2. Sufficiency of the Evidence in Parental-Termination Cases

In reviewing the evidence for legal sufficiency in parental-termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment and assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence, even if it is contrary to the finding. *Id.*

It is necessary to consider all of the evidence, not just that which favors the verdict. *Id.* However, we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is within the fact-finder's province. *Id.* at 573-74. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and be careful to not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether,

on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d at 108.

### 3. Best Interest of the Child Factors

The supreme court has devised the following list of several non-exclusive factors that the fact-finder may consider in determining the best interest of the child: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent, which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases, and other factors not on the list may also be considered when appropriate. *In re C.H.*, 89 S.W.3d at 27; *see* TEX. FAM. CODE ANN. § 263.307 (West 2008) (outlining additional

In the Interest of L.D.E. and C.E., Children                                                                 Page 11

factors that the trial court may consider in determining the best interest of the children). Furthermore, undisputed evidence on just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

At the conclusion of the trial, the trial court found that Robert had engaged in conduct prohibited by section 161.001 of the family code—namely, (1) knowingly placing or knowingly allowing the children to remain in conditions or surroundings that endanger the physical and emotional well-being of the children and (2) knowingly placing the children with persons who engaged in conduct that endanger the children's physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E).[7] Robert filed a motion for new trial, and after conducting a hearing on Robert's motion, the trial court entered several findings of fact and conclusions of law. Among the findings of fact made by the trial court were:

> 7. The Court finds that [Robert] and [Lucy] have each demonstrated an inability to provide the children with a safe environment.
>
> 8. The Court finds that the appointment of the DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES as managing conservator of the children is in the best interest of each of the children.
>
> 9. The Court finds that [Lucy] participated in a continuous course of domestic violence in the home; used marijuana while pregnant; and used marijuana and cocaine.

---

[7] On appeal, Robert does not challenge the trial court's finding with respect to section 161.001(1). *See* TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2008). Instead, he focuses his appeal on whether the termination of his parental rights was in the best interest of the children. *See id.* § 161.001(2).

10. The Court finds that [Robert] participated in a continuous course of domestic violence in the home; continued to use alcohol, at times while in possession of the children; and his use alcohol subjected him to the risk of parole revocation.

11. The Court finds that the Department attempted two periods of reunification of the children with Respondents [Robert and Lucy] under monitored returns in the home and that each time the children were removed from the Respondents' care due to incidents of family violence.

The record is replete with testimony from witnesses about numerous instances of domestic violence between Robert and Lucy. In fact, the children were removed from Robert and Lucy's home on three different occasions because of incidents of domestic violence. James Shinder, a psychologist who worked with the family, testified that Robert described an incident where Lucy pulled a knife on him. Lucy told Shinder about several instances of violence between Robert and herself, which Shinder described as "fairly significant" in nature. As a result of the knife incident, Lucy was charged with aggravated assault with a deadly weapon, though the charge was reduced to making a terroristic threat. The third removal of the children was precipitated by Robert breaking a window in the apartment in order to gain access to the home late one evening. After breaking the window, Robert reached in and unlocked the dead-bolt lock on the door. Shortly thereafter, Lucy encountered Robert, and Robert pinned Lucy to the floor.[8] As she fell to the floor, Lucy sustained a cut from the broken window glass. The police report indicated that the children witnessed the entire episode, a fact

---

[8] Robert explained that he pinned Lucy down in front of the children for the purpose of calming Lucy down and to "get her quiet." However, when further questioned about the incident, Robert claimed to not know why he pinned Lucy down and acknowledged that she did not hit him or have a weapon when he pinned her down.

that Robert confirmed in his testimony. Robert also admitted that he had drunk "one, two beers" prior to going over to the apartment that evening.

Robert also admitted that he and Lucy had broken each other's car windshields during another domestic dispute and that Lucy had previously threatened to kill him. Lucy acknowledged that law enforcement had been called to the family home as a result of domestic violence on a number of occasions. She also admitted to having smoked marihuana through most of her pregnancy with C.E. In order to facilitate the return of the children to his household, Robert was instructed to stay away from Lucy; however, Robert testified that he often visits Lucy, including a week before trial, because he loves her.[9] Robert also testified that he does not work, as he injured his back at his previous job. Instead, Robert collects workers' compensation benefits.

Robert's parole officer, Courtney Shell, stated that Robert had been "fairly compliant" with the conditions of his parole. She noted that Robert had some issues with paying fees, but that was due to the fact that he is not working. Shell was not aware that Robert regularly drinks alcohol and stated that if he was doing so, then Robert was violating the conditions of his parole. Shell recalled that in 2006 and in 2008, Robert received sanctions for testing positive for cocaine and marihuana, though Robert denied ever using drugs.

Shinder testified that Robert admitted to consuming a twenty-four ounce can of beer each day, an amount that concerned Shinder. Moreover, Robert testified that he

---

[9] Specifically, Robert stated that he "love[s Lucy]. We got a lot of ties together. It's hard to let go after five years. I got to say something to her, you know. It is just something I need."

drank alcohol each day, even though such acts were in violation of his probation. Shinder also noted that, on five occasions, his office tried to work with Robert to complete psychological and parenting assessments, but Robert "did not . . . complete the full battery of testing." Shinder did, however, get Robert to participate in a couple of personality tests. Based on the results of these tests, Shinder determined that Robert had an antisocial personality disorder and that he met the criteria for "schizoid personality traits." Based on his evaluation of Robert, Shinder had "major concerns" about Robert's ability to properly parent L.D.E. and C.E.

Regarding the impact of the domestic violence on the children, Louis Rishkofski, the therapist for L.D.E., testified that he observed L.D.E. exhibit behaviors consistent with witnessing domestic violence.[10] The behaviors, including an inability to play, depressive symptoms, aggression towards toys, limited vocabulary, and a limited desire to interact with others, concerned Rishkofski to such a degree that he believed that L.D.E. may be suffering from post-traumatic stress disorder as a result of observing Robert and Lucy's incidents of domestic violence. When asked to draw her family, L.D.E. drew "squiggles," which Rishkofski determined were "very regressed" for a child L.D.E.'s age. Rishkofski recalled that L.D.E. expressed to him spontaneously that "Dad [Robert] hit Mom [Lucy], and that hurts." L.D.E. also described other incidents of domestic violence between Robert and Lucy and that those incidents caused L.D.E. to be fearful. Rishkofski did state, however, that it appeared that L.D.E. had "more

---

[10] At the time of removal, C.E. was five months old and, therefore, was too young to participate in therapy.

connection with dad than with mom, even though the connections appear confused." Rishkofski was very concerned about L.D.E.'s propensity to be aggressive with her toys because he believed that she "may be modeling the very thing she witnessed." When asked whether she wanted to live with Robert, L.D.E. initially said "no," but she said "yes" later in the conversation with Rishkofski. Nevertheless, Rishkofski believed that L.D.E. would be set back developmentally if returned to Robert and Lucy's home where another instance of domestic violence was likely. According to Rishkofski, it appeared as if L.D.E. responded to observing the incidents of domestic violence by regressing or "shut[ting] down emotionally and choos[ing] not to feel or doesn't know what to feel."

Brian Miller, a school psychologist, stated that he began working with L.D.E. in August 2009, when L.D.E. was three years old. Based on his initial observations, Miller was concerned that L.D.E.'s speech was not consistent with a normal three year old. Miller also noticed that L.D.E. did not know how to play with toys. L.D.E. "tended to be more withdrawn, not seeking interaction with other children or with adults." In September 2009, Miller administered the "Brigance screener," and L.D.E. initially scored eighteen out of one hundred points. Miller testified that the "Brigance screener" was a widely accepted test used to measure developmental skills, based on "knowledge of colors, knowledge of numbers, things of that nature." Miller administered the test six months later, while L.D.E. was in foster care, and L.D.E. scored a fifty out of one hundred points. The increase in the score indicated to Miller that L.D.E. "has the ability to learn" and did not have a "developmental disorder like mental retardation . . . ." Miller expressed concern that Robert and Lucy were not following through with L.D.E.

at home to encourage her development. In addition, Miller noted that he did not believe that Robert and Lucy's home was "a safe situation."

Kelly Stewart, a director at the Blessings From Above Day Care where L.D.E. and C.E. attended, recalled an instance where Robert picked up the girls from daycare around 4:30 or 5:00 p.m. At this time, Stewart believed that Robert was drunk. He apparently smelled of alcohol, had slurred speech, and had hazy eyes. Stewart called the police; however, Robert left with the children before the police arrived at the daycare. When asked whether the children appeared comfortable with Robert, Stewart stated that "[t]hey never wanted to leave with him. They always cried when he came to pick them up. They always wanted to stay."

Paul Johnson, a licensed professional counselor who began working with the family in December 2008, noted that Robert missed several counseling appointments without providing Johnson with notice, including one appointment just prior to the trial of this matter. Nevertheless, Johnson stated that Robert had made some progress in counseling and recommended that Robert's parental rights not be terminated—a recommendation that was echoed by the children's attorney ad litem. Johnson's only concerns about Robert's ability to parent had "to do with contact with [Lucy] and how they resolve problems."

Caseworkers for the Department testified that they had four different addresses on file for Robert and Lucy since 2008. Caseworkers also noted that Robert was not honest with them regarding his living situation. Robert initially lived with his sister; however, he later moved in with his dying mother and his mentally-disabled sister

without telling the Department or his parole officer about the move. Caseworkers described the start of supervised visits with Robert and Lucy at a local McDonald's as such:

> A mess. They're [the children] screaming and crying. They don't want to leave the sight of the foster parent. They don't want to start the visit. There are temper tantrums when the other parent shows up and they are ready to go home by the end of the visit to the foster mom.

Regarding the current placement of the children, caseworkers indicated that the children were not placed in a "foster-to-adopt home." When asked whether placement with Robert would be in the best interests of the children, Department caseworker Kelly Allen stated that:

> Since I have had the case, I feel that even though a solution was put on the table that would allow for the children to be returned to one parent, services were not taken seriously.
>
> [Robert] continued to miss therapy sessions, an apartment was not obtained on his behalf.
>
> When you are told that this is the way to get your children back and for several months in a row you don't do it, I don't see how that is in the best interests of the children to place back on the day of trial.
>
> The repeated disturbances out to the house, the lies that I have been told by each parent that: Yes, we're staying apart, and they're not.
>
> From [Robert]: This is my home address, and it isn't.
>
> From [Lucy]: Not using her therapy session wisely, knowing that she is under the radar, it leads me to think:
>
> What does it take for each parent to really take this case seriously and to really do what is asked of them?
>
> They have had two years to essentially show progress in therapy, to obtain employment, to get housing.

I understand that [Robert] has had difficulty with employment due to an injury, but that is not an excuse for why he has not obtained housing, and why he has not been forthright with me about where he lives.

Allen also noted that she told Robert about programs that the Department has to assist those with meager finances in finding living accommodations; Robert chose not to take advantage of these programs.

Based on the foregoing evidence, a reasonable fact-finder could deduce that Robert has a problem with alcohol and violence, both of which could ultimately result in the revocation of his probation. In addition, a reasonable fact-finder could infer that Robert is incapable of providing a safe environment for the children, especially given his propensity to visit with Lucy and the frequent violence that erupts when the two get together. The record also indicates that the children were in foster care for two years and that the trial court authorized the monitored return of the children to Robert and Lucy on two different occasions, yet both occasions resulted in the Department having to remove the children due to domestic violence. It is also evident that the children's development has been stunted by their exposure to the numerous instances of domestic violence between Robert and Lucy and that their development would be further stunted by observing additional instances of domestic violence. It is clear that the evidence touches on several of the best interest factors articulated in *Holley*, *In re C.H.*, and section 263.307 of the family code. *See Holley*, 544 S.W.2d at 371-72; *see also* TEX. FAM. CODE ANN. § 263.307; *In re C.H.*, 89 S.W.3d at 27. As a result, we conclude that a fact-finder could reasonably form a firm belief or conviction that termination was in the

best interests of the children. *See In re J.P.B.*, 180 S.W.3d at 573; *see also In re H.R.M.*, 209 S.W.3d at 108; *In re C.H.*, 89 S.W.3d at 28. Accordingly, we hold that the evidence is legally and factually sufficient to establish that the termination of Robert's parental rights is in the best interests of L.D.E. and C.E. *See In re J.P.B.*, 180 S.W.3d at 573; *see also In re H.R.M.*, 209 S.W.3d at 108; *In re C.H.*, 89 S.W.3d at 28. We overrule Robert's second issue.

### IV. CONCLUSION

Having overruled both of Robert's issues on appeal, we affirm the judgment of the trial court.

AL SCOGGINS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed July 20, 2011
[CV06]